**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LARRY J. SYKES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 07-42 (RMC)** |
| ) | |
| **JANET NAPOLITANO, Secretary,** ) | |
| **Department of Homeland Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM OPINION**

Larry Sykes complains that he was involuntarily reassigned by the United States

Secret Service to a less advantageous position because of his race.  He sues Janet Napolitano,

Secretary of the Department of Homeland Security, of which the Secret Service is a part, in her

official capacity.  Mr Sykes has proffered an expert upon whose opinion he intends to rely in

rebutting any defense motion for summary judgment and at trial.  Defendant has moved to disqualify

the expert on the basis that he is not properly qualified to offer testimony as an expert.  For the

reasons explained herein, the Court will grant Defendant's motion to disqualify Plaintiff's expert.

**I.  BACKGROUND**

**A.  Mr. Wyatt's Expertise**

Larry Sykes is an employee of the Secret Service.  He was the Special Agent in

Charge ("SAIC") of the Johnson[2] Protective Division, Austin, Texas, before being involuntarily

---

[1]  Pursuant to Federal Rule of Civil Procedure 25(d), Janet Napolitano is substituted as
Secretary for her predecessor, Michael Chertoff, Secretary of the Department of Homeland Security.

[2]  As the widow of former President Lyndon B. Johnson, Lady Bird Johnson is entitled to
Secret Service protection for her lifetime.

reassigned to the position of Assistant Special Agent in Charge ("ASAIC") of the John J. Rowley

Training Center, Beltsville, Maryland.  He complains that the involuntary transfer is an adverse

action taken because of his race.  He alleges that the pretextual basis for this reassignment was his

"supposed improper response to the actions of several insubordinate, emotionally disturbed, and

potentially threatening employees under his supervision."  Compl. ¶ 6.

Mr. Sykes has proffered Jerry O. Wyatt as an expert witness.  Mr. Wyatt has been

president of his own company, Wyatt Security Consultants, LLC, since 2005.  More pertinent to his

potential testimony are his 26 years in the Secret Service (1976-2001),[3] followed by a short stint as

SAIC, Environmental Protection Agency, Houston, Texas (2002), and some years as Federal

Security Director, Department of Homeland Security, Houston, Texas (2002-2005).  Mr. Wyatt

provides his background:

> I am a retired Special Agent in Charge, Senior Executive Service
> (SES) who was promoted through positions of increasing
> responsibility, ultimately progressing up the ranks to the Senior
> Executive Service, the top leadership positions for the U.S. Secret
> Service.  My career spanned 26 years.  During my career, I was
> assigned to investigative offices and protective divisions in
> Albuquerque, New Mexico; New York, New York; Newark, New
> Jersey; Washington, D.C.; Las Vegas, Nevada; Los Angeles,
> California; and Houston, Texas.  I was assigned to the Participating
> Inspectors Program and conducted office inspections to determine
> operational and administrative compliance.  At the conclusions of
> these inspections, I made commendations or recommendations for

---

[3]  Mr. Wyatt's resume reflects the years "1976 to 2001" and his position with the Secret
Service, "Special Agent in Charge (Senior Executive Service)."  Def.'s Mem. in Supp. of Mot. to
Disqualify ("Def.'s Mem."), Ex. A (Expert Report of Jerry O. Wyatt ("Wyatt Report")) at Resume.
The Secret Service reports that he "became an SES-level SAIC in 2000 and served as a SAIC in the
Secret Service for only 18 months before leaving the agency."  *Id.*, Ex. B (Declaration of Julia
Pierson ("Pierson Decl.")) ¶ 11.  This limiting fact is barely acknowledged by his resume, which
indicates that he was "[p]romoted through positions of increasing responsibility, ultimately
progressing up the ranks to the Senior Executive Service . . . ."  Wyatt Report at Resume.

improvements.  I participated in numerous employee misconduct
investigations and personnel performance assessments.

Wyatt Report at 2.  Since his retirement from the Secret Service, Mr. Wyatt worked briefly for the

EPA and DHS.  In the latter position, he "had complete accountability for security operations at three

U.S. airports in Houston and Beaumont, Texas," as he "transitioned passenger and baggage screening

operations from private contractor employees to federal employees on time and within budget."  *Id.*

at 3.  Mr. Wyatt reports no private sector experience until his retirement when he started his own

consulting business.

Mr. Wyatt is called upon to testify to two issues:  the first "concerns the legal standard

in an employment discrimination claim" and the second "concerns the way or ways that a supervisor

should handle information given to him by a third party concerning a possible relationship between

two agents."  *Id.* at 1-2.  As to the second issue, counsel for Mr. Sykes asked Mr. Wyatt to "address

the issue of a [sic] whether senior management of the Secret Service is expected to proceed against

a Special Agent In Charge when he and a staff agent disagree about whether the agent transmitted

a complete account of the details of a complaint that might involve sexual conduct."  *Id.* at 2.

### B.  Mr. Wyatt's Expert Report

Mr. Wyatt's expert report comes to two conclusions:

1.  "[T]he involuntary demotion from SAIC to ASAIC
greatly diminished the Plaintiff's possibility of further
advancement, and damaged his professional
standing[;]" and

2.  "[I]t appear[s] that the Plaintiff immediately upon
notification initiated appropriate measures to neutralize
the situation."

*Id.* at 4-5.

Mr. Wyatt explains that the Secret Service has two missions: protection and criminal investigation. The Secret Service was first called into protection after the assassination of President William McKinley in 1901; it protects the President, Vice President, their immediate families, former Presidents (now limited to the first ten years after they leave office), visiting heads of foreign states, and others. The investigative mission of the Secret Service actually came first. It was formed in 1865 to investigate and prosecute counterfeit fraud. It has now expanded into various crimes involving counterfeiting, financial institution fraud, computer and telecommunication fraud, and money laundering. *See generally,* [www.secretservice.gov](www.secretservice.gov) (last visited on June 1, 2009). Mr. Wyatt opines that "the protection component has always been the most prestigious assignment." Wyatt Report at 4.

He supports his first conclusion with the following opinions:

> To the best of my knowledge, no one who has been involuntarily demoted from the SAIC of a Protective Division to ASAIC of James J. Rowley Training Center has ever recovered the loss of status, earning potential and upward mobility. Simply speaking, this involuntary reassignment reduced Plaintiff from being the #1 leader of a prestigious protection division who reports to a Deputy Assistant (DAD) or Assistant Director (AD) to one of a number [of] ASAICs (#3s) who report to a DSAIC (#2) and a SAIC (#1) of a non protection division.

> Although on paper, the Plaintiff remained at the same pay grade, his take home is negatively affected by the increased taxation, home prices and other quality of life expenses incurred at his reassigned duty station.

> Additionally, this reassignment affects his advancement and future employment upon retirement. . . . The Plaintiff's reassignment has in effect voided any chance that he would be considered for a SES position.

> Also, this reassignment will have a negative effect on his post

retirement earning potential because employers routinely offer higher salaries to division leaders as opposed to supervisors.

This reassignment will also have a negative effect on his ability to lead employees at his reassigned location because he will be considered a demoted supervisor who has no "juice" to get employees career enhancing assignments or promotions.

*Id.*

Mr. Wyatt supports his second conclusion with the following opinions:

Supervisors are mandated to act swiftly and diligently upon notification of an allegation of sexual harassment by the recipient of the act. When an allegation of sexual harassment is levied by a third party, the initiation of the resolution phase is not etched in stone. A fair and balance[d] inquiry and/or investigation with an emphasis on due process [is] required to establish the validity of the accusation and the necessary corrective actions.

[T]he process put in place to provide an effective and orderly reporting process . . . was not properly followed by the offended party.

By the [offended] party's own admission, there was a reluctance to notify the plaintiff on the belief that he [would] not [be] impartial. . . . [T]he offended party "chose not to go to my SAIC because I did not feel he would handle the situation."

The offended party did not provide any credible information that justified this belief. Instead the offended party told SA McKenna, a male agent, and singularly or together, informed two additional agents, SA Kelly, a male[,] and SA Harkness, a female.

SA McKenna[] claims that he informed the Plaintiff of the sexual harassment allegation and the Plaintiff did not act upon the allegation[]. The Plaintiff countered by stating that SA McKenna informed him that SA Broussard and SA Klish were having relational issues and never uttered or inferred that SA Broussard was claiming sexual harassment. Although both have different versions of what was said in their conversation, certain facts are clear.

First, the Plaintiff initiated steps to ensure that [] SA Broussard and

SA Klish did not work together while he inquired into this alleged relationship.

Second, the Plaintiff approached SA Broussard, asked how things were going and inquired if there was any matter he needed to address. SA Broussard did not inform him of her alleged claim of sexual harassment.

Third, SA McKenna was administered a polygraph examination to substantiate his claims and the results were inconclusive.

*Id.* at 5.

Mr. Wyatt further opines that:

[SA Broussard] chose to originally confide in three SAs who were not supervisors and who by their own admission were unhappy with their status in the organization and not supporters of the Plaintiff. It appears to me that SA McKenna and SA Kelly manipulated SA Broussard['s] reluctance to talk into a self serving campaign to discredit the Plaintiff.

SA Kelly wrote an email to Deputy Assistant Director Rebecca Ediger and forwarded a memorandum to Headquarters. . . . SA Kelly did not advise the Plaintiff that he was forwarding this email. USSS policy and procedure requires that Plaintiff be forwarded [sic] via the chain of command. To deviate from this policy and procedure requires an urgent and justifiable reason[], i.e., fear of retaliation, etc.

There is nothing in the documents that I reviewed that indicate[s] that SA Kelly was motivated by anything other than self promotion and a fervent quest to discredit the Plaintiff.

[It is] unfair to hold the Plaintiff accountable for the way this allegation was eventually resolved. The Plaintiff never witnessed any infraction between the accused and accuser.

[During the investigation], SA Broussard refused to talk [to] the male Inspectors, and would only talk to a female inspector. Previously, she talked freely with SA McKenna and SA Kelly. This is another example of how this investigation was hampered by SA Broussard's lack of action for which the Plaintiff was blamed.

It is my experience that a division with inadequate personnel wouldn't be held to the same standard as a fully staffed division. Consequently, JPD[] shouldn't have received the lowest rating and the Plaintiff shouldn't [have been] penalized and subsequently demoted and reassigned.

This review revealed that the Plaintiff appropriately communicated with Headquarters, but his requests for assistance were not well received.  In fact it seems as if his request for assistance were [sic] ridiculed.   Specifically, the Plaintiff brought to Headquarters' attention hostile work environment issues that were occurring on the detail. . . .   Instead of addressing the hostile work environment occurrences, a fact finding mission was initiated that glossed over these performance hindering issues and resulted in an action being taken against the Plaintiff.

*Id.* at 6-8.

## II.  LEGAL STANDARDS

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The trial court serves as a gatekeeper to ensure that all expert testimony "is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) (addressing scientific expert testimony); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999) (extending the gatekeeping obligation to technical and other specialized expert testimony). The burden is on the proponent of the testimony to show by a preponderance of the evidence that the

proffered expert witness is qualified, that his proposed testimony would be useful to the finder of fact, and that the testimony is reliable. *See Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001); *Young v. Burton*, 567 F. Supp. 2d 121, 128 (D.D.C. 2008).

The Federal Rules of Civil Procedure also require that a party disclosing the identity of an expert witness also disclose a written report — prepared and signed by the expert witness — that contains: (i) a complete statement of all of the expert's opinions and their bases and reasons; (ii) all information considered by the expert in forming his opinions; (iii) any exhibits that the expert will use; (iv) the expert's qualifications, including all publications authored in the last ten years; (v) other cases in which the person has served as an expert within the previous four years; and (vi) how much the expert is being paid for his testimony. Fed. R. Civ. P. 26(a)(2)(B).

## III. ANALYSIS

Plaintiff disclosed Mr. Wyatt as an expert on May 30, 2008. Def.'s Mem. at 5 n.2. His expert report is missing any mention of publications, other cases, and how much he is being paid. Plaintiff's counsel informs the Court that Mr. Wyatt has no publications, has never been accepted as an expert before, and the issue of his compensation is unresolved. Since this information was supposed to be *in* the expert report, its delayed arrival constitutes at least a technical violation of Rule 26. More critical, however, is the absence of the "bases and reasons" for Mr. Wyatt's opinions.

### A. First Opinion

Although the expert report inexpertly declares that the first issue to be addressed "concerns the legal standard in an employment discrimination claim," that purely legal issue is not actually what Mr. Wyatt attempts to address (and, indeed, the Court needs no legal advice from him).

Unsaid but what he attempts to accomplish is to apply the legal standard (undoubtedly provided by Plaintiff's counsel, an experienced employment lawyer, and not by Mr. Wyatt at all) to the facts as Mr. Wyatt understands them to opine that Mr. Sykes' transfer was an adverse action, even though his pay and benefits remained the same.  This determination is one for the Court on summary judgment or the jury after trial, not Mr. Wyatt.

First, one must recognize that Mr. Wyatt never explains or addresses any "damage to [Mr. Sykes'] professional reputation," which is specifically mentioned in his opinion.  *See* Wyatt Report at 4 ("[T]he involuntary demotion from SAIC to ASAIC . . . damaged his professional standing").  Perhaps he refers to the alleged fact that Mr. Sykes' subordinates will think he has insufficient "juice" to help their careers, but no connection is ever made.  Mr. Wyatt does not provide any basis for knowing Mr. Sykes' reputation before, or after, his involuntary transfer beyond what any lay person may infer from the presentation of evidence.  Thus, this part of his "expert" opinion is lacking in foundation, lacking in expertise, and would not assist the jury but would supplant it.

Second, the statement, "[t]o the best of my knowledge, no one who has been involuntarily demoted from the SAIC of a Protective Division to ASAIC of James J. Rowley Training Center has ever recovered the loss of status, earning potential and upward mobility," *id.*, has no foundation.  Has *anyone* before Mr. Sykes ever been involuntarily transferred from SAIC of a Protective Division to ASAIC at the Rowley Training Center?  Have many agents had that experience?  There is no basis for Mr. Wyatt's attempt to make "the best of his knowledge" into a fact that could reliably be presented to a jury.

Next, Mr. Wyatt offers pure hearsay evidence:  "Although on paper, the Plaintiff remained at the same pay grade, his take home is negatively affected by the increased taxation, home

prices and other quality of life expenses incurred at his reassigned duty station." *Id.*  While his resume indicates that at some point in his career Mr. Wyatt worked in Washington, D.C., he gives no indication that he worked in Austin (where the Johnson Protective Division is located) or that he knows from personal expertise about "taxation, home prices and other [unidentified] quality of life expenses" in Beltsville, Maryland.  To the extent that this statement is accurate, the evidence must come from a person who knows the facts — such as the Plaintiff, whose credibility will be evaluated by the jury — and not an "expert" who has no basis to offer such an opinion.

Mr. Wyatt's third opinion comes closer to the mark:  "Additionally, this reassignment affects his advancement and future employment upon retirement. . . .  The Plaintiff's reassignment has in effect voided any chance that he would be considered for a SES position." *Id.*  While this statement may well be true, the problem with having Mr. Wyatt offer it as an expert to a jury is that he provides no authority for it.  Mr. Wyatt does not indicate that he ever selected agents for the Senior Executive Service at the Secret Service (or elsewhere) and Defendant swears that he did not. *See* Pierson Decl. ¶ 13.  He gives no background knowledge except his own 18 months in the SES — but not anything about the selection process he underwent — to support his conclusion.  Mr. Wyatt's common sense conclusion that Mr. Sykes might be perceived as "damaged goods" would be of no assistance to a jury, all of whom have their own common sense to guide their conclusions.

Fourth, Mr. Wyatt offers commentary on the hiring practices of private sector employers, a group he joined (if he has employees) only in 2005:  "Also, this reassignment will have a negative effect on his post retirement earning potential because employers routinely offer higher salaries to division leaders as opposed to supervisors." Wyatt Report at 4.  Perhaps Mr. Wyatt could offer an experiential basis for this opinion from his own job search in the private sector but he gives

no hint of it.  His resume indicates a full and successful federal career and a personal consulting business.  If Mr. Wyatt knows of the experiences of other division leaders and supervisors from the Secret Service moving into the private sector, his knowledge is pure hearsay and well beyond his asserted expertise.

Whether Mr. Wyatt can offer, as an expert, his fifth opinion that Mr. Sykes will have management problems because his employees will perceive him as having no "juice," *id.*, is highly questionable.  This opinion does not arise from expertise as defined in Rule 702.  It is merely part of having lived.  Jurors have also lived.  They would not be assisted by Mr. Wyatt's opinion as to the consequences that arise from life.

### B.  Second Opinion

SA Broussard told other agents that she felt she was being sexually harassed by a fellow agent but did not report it to SAIC Sykes or through any other official channel; she complained to fellow agents and one forwarded her email to a senior manager.  One of the outcomes from an investigation into her report was the transfer of Mr. Sykes to Maryland.  Mr. Wyatt opines: "[I]t appear[s] that the Plaintiff immediately upon notification initiated appropriate measures to neutralize the situation."  *Id.* at 5.  The question here is *not* whether Mr. Sykes responded appropriately but only whether Mr. Wyatt has the expertise to offer an opinion on the matter.

He does not.  Mr. Wyatt does not offer "expert" testimony based on his years of experience in the Secret Service.  Instead, he decides credibility on an incomplete written record, offers conclusions that have no basis in fact revealed from his report, and advocates for the Plaintiff rather than providing expertise to the fact-finder.

Mr. Wyatt draws an adverse inference from the fact that, on the limited papers before

him, "[t]he offended party did not provide any credible information that justified this belief [that she could not report to SAIC Sykes]." *Id.* This is not expertise drawn from years with the Secret Service. This is pure substitution for the role of the jury.

Mr. Wyatt provides no basis — expert or other — for his statement, "It appears to me that SA McKenna and SA Kelly manipulated SA Broussard['s] reluctance to talk into a self serving campaign to discredit the Plaintiff." *Id.* at 6. His opinion is not "expert," wherever it comes from. It is merely the conclusion of a lay person who reviewed limited information on behalf of a person with an interest in the outcome. Lay opinions without a basis in education, experience or other specialized knowledge do not assist a jury, but merely distract or interfere with its deliberations.

Similarly, the "expert" statement, "[t]here is nothing in the documents that I reviewed that indicate[s] that SA Kelly was motivated by anything other than self promotion and a fervent quest to discredit the Plaintiff,"*id.*, is meaningless. Mr. Wyatt reviewed limited documents, he heard from no witness, he read no briefs, he read no law, he heard no arguments. And yet, he attempts to offer, as "expert testimony," the conclusion that SA Kelly had bad motives. Even assuming such to be true, if superior officers credited SA Kelly without knowing of his alleged bad motives, how would that rescue Mr. Sykes? This is not expertise. Mr. Wyatt offers only his lay opinions about the credibility of others he has never even met.

Mr. Wyatt opines: "[It is] unfair to hold the Plaintiff accountable for the way this allegation was eventually resolved." *Id.* He further offers that "this investigation was hampered by SA Broussard's lack of action for which the Plaintiff was blamed." *Id.* These are not expert opinions, arising from Mr. Wyatt's employment experience or expertise. These are pure lay

opinions, which cannot be the basis for expert testimony.

And then we come to Mr. Wyatt's final opinions: (1) "JPD[] shouldn't have received the lowest rating and the Plaintiff shouldn't [have been] penalized and subsequently demoted and reassigned;" and (2) "Plaintiff appropriately communicated with Headquarters but his requests for assistance were not well received."  *Id.* at 7.  These opinions, as well, are not based on "expertise" but constitute only lay opinion.  Mr. Wyatt provides no basis or rationale to support these opinions and they appear merely to reflect a difference of opinion between Mr. Wyatt and managers within the Secret Service as to how to handle the situation.  "Should not" is very rarely the basis for an *expert* opinion; by its very tense, it represents a value judgment.  The courts do not function as personnel offices to determine what management "should" have done; our job is to ensure that when management violates a legal requirement, it is held accountable.  Mr. Wyatt's expert report does not aid in that process.[4]

## IV.  CONCLUSION

For the reasons stated, the Court **GRANTS** Defendant's motion to disqualify the expert report and testimony of Jerry O. Wyatt [Dkt. # 17].  A memorializing Order accompanies this Memorandum Opinion.

Date: June 25, 2009                                          /s/
                                          ROSEMARY M. COLLYER
                                          United States District Judge

---

[4]  The Court notes that Plaintiff's lead counsel has submitted his own affidavit for the purpose of "documenting my own use of experts in the defense of the federal government in employment litigation, as well as in cases against the federal government . . . ."  Pl.'s Mem. in Opp'n to Mot. to Disqualify, Ex. 2 (Declaration of Robert C. Seldon) ¶ 2.  The issue is not whether experts are appropriate in employment litigation, but whether Mr. Wyatt is an expert who may opine on these issues.