## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **LARRY J. SYKES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Civil Action No. 07-42 (RMC)** |
| | ) |
| **JANET NAPOLITANO, Secretary,** | ) |
| **Department of Homeland Security,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM OPINION

Larry J. Sykes was the Special Agent in Charge of the Secret Service detail that protected Claudia "Lady Bird" Johnson, former First Lady of the United States, from April 2003 to September 2005, when he was involuntarily reassigned to the position of Assistant Special Agent in Charge at the Secret Service's J.J. Rowley Training Center. Mr. Sykes complains here that the reassignment was an adverse employment action due to his race, African American. Having carefully studied the parties' briefs and voluminous exhibits, the Court concludes that Mr. Sykes's reassignment within the Secret Service was not an adverse employment action within the meaning of Title VII case law and that, even if it were, there is a dearth of evidence to show pretext in the face of the Secret Service's legitimate, non-discriminatory reasons for the transfer. Summary judgment will be granted to the Defendant.

## I. FACTS

Without a doubt, Larry J. Sykes has had an impressive career in the Secret Service

("Service").[1]  He joined the Service as a GS-7 Special Agent on June 13, 1983.  Because of the nature of the Secret Service, on his first day he signed an "Acknowledgement of Employment Reassignment Condition," accepting "as a condition of employment that [he] may be geographically reassigned at the discretion of the Secret Service" throughout his career.  Def.'s Mot. [Dkt. #32], Ex. 3, Sykes Acknowledgment ("Acknowledgment").  Mr. Sykes first worked in the Indianapolis Field Office until September 1987, rising to a GS-12 along the way.  In September 1987, he was reassigned and geographically relocated to the Western Protective Division, where he was promoted to the GS-13 level.  In early 1992, at his request, he was transferred to the Los Angeles Field Office. Less than a year later, Mr. Sykes transferred to the Santa Barbara Resident Office, which falls under the L.A. office and did not require that he move.  In late 1994, at his request, he transferred to the Chicago Field Office.

In 1998, Mr. Sykes requested and received a transfer to the training division of the Secret Service so that he would be in "the career path that would lead to additional promotion within the Secret Service."  Def.'s Mot., Ex. 1, Deposition of Larry Sykes ("Sykes Dep.") 112.  In 2000, Mr. Sykes bid for and received a promotion to a GS-14 Assistant to the Special Agent in Charge ("ASAIC") position on the Vice Presidential Protective Division, where he was engaged in training agents.  He bid for and received a reassignment in 2002 to a GS-14 ASAIC position in the

_____

[1] Since 2001, the Secret Service has been a constituent agency of the Department of Homeland Security, whose Secretary, Janet Napolitano, is sued in her official capacity. The Service is a law enforcement agency with two primary duties: (1) the protection of the President and Vice President and their families, including former Presidents and Vice Presidents and their families, and visiting foreign heads of state, 18 U.S.C. § 3056(a), and (2) the investigation and arrest of individuals who violate criminal laws relating to, *inter alia*, government bonds, coins, obligations, electronic fund transfers, credit and debit card fraud, false identification documents, and fraud committed against financial institutions. 18 U.S.C. § 3056(b).

Investigative Support Division in Secret Service Headquarters in Washington, D.C. Mr. Sykes then bid for and received a promotion to a GS-15 Special Agent in Charge ("SAIC") position in 2003 to head the Johnson Protective Division ("JPD"), which provided protection to Lady Bird Johnson.

Mrs. Johnson, the widow of former President Lyndon Baines Johnson, was in her nineties at the time. There were no directed threats towards Mrs. Johnson and the detail was very slow-paced. As SAIC, Mr. Sykes's duties were to oversee "the operations, budget, and security of JPD . . . as well as all personnel actions relating to its operations." Compl. ¶ 18. Mr. Sykes supervised one GS-14 ASAIC and nine to eighteen other employees, which included Special Agents and special officers. Sykes Dep. 157; Compl. ¶ 18. The JPD worked at three locations: the field office in Austin, Texas; Mrs. Johnson's Austin residence located approximately six miles from the field office; and the Lyndon Baines Johnson ranch located approximately fifty miles away from the field office.

As SAIC of the Johnson Protective Division, Mr. Sykes reported directly to the Deputy Assistant Director ("DAD") of the Office of Protective Operations, Thomas Grupski. Starting in June 2003, his second line supervisor was Assistant Director ("AD") of the Office of Protective Operations, Mark Sullivan.[2]

### A. Office Inspection

A routine office inspection was conducted on the Johnson Protective Division in December 2004. Mr. Sykes was attending a family funeral out of town and was not present during the week-long inspection. The lead inspector informed Mr. Sykes, in a close-out telephone conference, that his recommended rating would be "good." Pl.'s Opp'n [Dkt. #37] ("Opp'n"),

---

[2] Mr. Sullivan is currently the Director of the Secret Service.

Excerpts of Sykes Deposition ("Sykes Excerpts") 264-65.[3]  However, the final 2004 Inspection Report reflects that the JPD received an overall evaluation of "Fair."  Def.'s Mot., Ex. 4, 2004 Inspection Report ("2004 Inspection Report") 5.  In the Management Section of the report, the JPD received a "Recommendation," which is the lowest rating a division can receive.  *Id.*  Under the prior SAIC, the Johnson Protective Division's management had been rated "Very Good" in a 2002 inspection report.

The 2004 Inspection Report stated that "[e]mployees were critical of the chronic absence of supervisors during in-district protective motorcade movements, particularly movements to the Lyndon Baines Johnson (LBJ) Ranch"; that "[e]mployees were critical of the lack of a consistent supervisory presence at the Austin residence and the LBJ Ranch when the protectee is in residence"; and that "[e]mployees were critical of the perceived lack of adequate interpersonal communication between supervisors and detail personnel, as well as the fact that most communication is accomplished through e-mail and written directives."  *Id.* at 5-6.  Further, the 2004 Inspection Report stated that "[i]n concert with the comments offered by division personnel, and to a greater extent as a result of the review of protective operations, the inspection team concluded that Johnson PD supervisors have exercised insufficient direct oversight of personnel and the division as a whole."  *Id.* at 6.  As a result, "[t]he inspection team determined that the SAIC and ASAIC of the Johnson PD are not sufficiently engaged in the daily activities of the detail," *id.* at 12, and that there was "clear indication of sick leave abuse."  *Id.* at 10.  The latter was caused by Mr. Sykes's custom of allowing Special Agents to supplement their annual leave with sick leave.  Sykes Dep.

---

[3]  Plaintiff and Defendant attached different excerpts from the deposition of Mr. Sykes. Plaintiff's excerpts are filed as attachments to his Opposition and can be found at Docket #37-5 and #37-6.

276-78. The 2004 Inspection Report recommended that "the SAIC and ASAIC urgently re-evaluate and drastically improve upon their degree of personal participation in protective movements, as well as their level of interaction with and direct supervision of division employees." 2004 Inspection Report 6.

The lead inspector contacted Mr. Sykes twice by telephone after their initial conversation. First, about a week after the inspection, the lead inspector told Mr. Sykes that the overall JPD rating was being downgraded from "good" to "fair" after a briefing session with AD Sullivan and DAD Grupski. Sykes Excerpts 383-384. Second, the lead inspector later informed Mr. Sykes that after further conversation with DAD Grupski, the Johnson Protective Division's rating would be further downgraded to a "fair with recommendations." *Id.* at 384-86. Having the "recommendations" attached to the rating was a downgrade in itself because it meant the JPD would have to be re-inspected. *Id.* at 386.

During an in-person briefing in Washington, D.C., Mr. Sykes was advised of the results of the inspection. *Id.* at 268. Mr. Sykes was counseled in writing regarding the results of the inspection and of the need for improvement. Mr. Sykes drafted a memorandum to the Director of the Secret Service outlining specific corrective actions the Johnson Protective Division would adopt to respond to the noted deficiencies. He cleared drafts of this document with DAD Grupski, who eventually approved the final memorandum. Mr. Sykes indicated that supervisory block coverage would be scheduled for each weekend but that additional coverage would require overtime of more than eight hours each weekend. DAD Grupski directed Mr. Sykes to remove the language concerning overtime. *Id.* at 271-273. In the end, DAD Grupski ordered Mr. Sykes to submit a final version of the memo that Mr. Sykes opposed. *Id.* Thereafter, Mr. Sykes worked overtime without

payment. *Id.* at 274-75.

### B. The Special Inspection

In late November 2004, Mr. Sykes met with Special Agent ("SA") Brian McKenna, a JPD agent, at SA McKenna's request. SA McKenna informed Mr. Sykes that one of the female agents on the Johnson Protective Division did not want a particular male agent to be the Scheduler, who assigns the various agents to their shifts. The parties do not agree on whether SA McKenna provided Mr. Sykes with a reason for this request, but it is not material to disposition of the motion. What is clear is that Mr. Sykes thereafter directed that the two agents not be scheduled to work together and that the male agent not be the Scheduler, as Mr. Sykes had originally intended. Sykes Dep. 238-244. The next day Mr. Sykes told the female agent that he had granted her request that the male agent not be the Scheduler. *Id.* at 244. Mr. Sykes also met separately with the male agent and the female agent to ascertain the motivation for the request. Mr. Sykes states that neither spoke of any inappropriate behavior. Sykes Excerpts 242-45.

That was not the end of the matter. On February 4, 2005, DAD Rebecca Ediger in Secret Service Headquarters received an email from SA Scott Kelly of the Johnson Protective Division alleging that a male agent had exposed himself to a female agent while on duty, that the incident had been reported to Mr. Sykes, and that no corrective action had occurred. Def.'s Mot., Ex. 10, Email from SA Kelly. As a result, a special inspection of the JPD was undertaken during February 8-10, 2005, which involved, among other things, interviews with all agents on the detail. During these interviews, SA McKenna stated that he had advised Mr. Sykes during their November 2004 meeting that a male agent had exposed himself to a female agent on two separate occasions. Mr. Sykes denies that SA McKenna reported any such event and states that SA McKenna only told

him that the female agent was not comfortable working with the male agent. When interviewed, the accused male agent admitted that he had exposed himself to the female agent on two occasions; he was suspended for 60 days as discipline.

### C. Mock Memoranda

In early April 2005, mock memoranda and a gun range poster with plastic knives attached were discovered at the Johnson Residence Command Post. Taped to the back of the gun range poster were plastic knives with the terms "GS-14," "GS-15," "EEO," and "T #" (transfer number) written on them. The poster had a caption: "Fun For the Whole Family: A New USSS Game 'Stab Your Way to the Top.'" Opp'n, Ex. 11, May 2005 Fact Finding Mem. ("2005 Fact Finding") 35. The fake memoranda — some of which were potentially threatening — spoke of various issues including workplace violence[4], Bible verses, and a "Four Step Get Over It Process" to allegedly help Service employees deal with a "growing trend" of supposed broken promises.[5] Mr. Sykes contacted DAD Grupski with respect to these issues. He then drafted and directed a memo dated April 11, 2005, to the Chief of the Personnel Division and to AD Sullivan stating that SA

---

[4] One memo included the following language:

> "It is impossible to determine who will assault coworkers, but considering the strong correlation between Service employees and the precursors of workplace violence, and the easy access of agents to lethal weapons, this [sic] Service determined that something must be done to mitigate the likelihood of [a] violent situation."

2005 Fact Finding 39.

[5] In speaking of the "steps" to get over the alleged broken promises, the memo defined two steps as "[d]enial - [t]he state of refusing to accept that a senior member of my Secret Service family could treat me like a bastard step child born of a Mongolian gang bang[]" and "[a]nger - [t]he desire to lash out at the above member of my 'family' through legal, congressional, verbal, physical or any combination of the aforementioned means." 2005 Fact Finding 40.

McKenna "appears to be suffering from a psychotic disorder" and identifying SA McKenna as the individual who had "apparently authored" all of the mock memoranda and whose written comments were contained on the gun range poster. Opp'n, Ex. 12, Sykes April 11, 2005 Memo 1, 9.

However, on April 25, 2005, SA Michael Moore, another Special Agent at the Johnson Protective Division, sent an email to DAD Grupski admitting that he had authored the majority of the five mock memoranda. A fact-finding team consisting of DAD Grupski and ASAIC Robert Buster went to the Johnson Protective Division on April 26, 2005 to interview the employees. During the investigation, SA Moore told them that he had created five of the six mock memoranda. SA Moore stated that the mock memoranda, which were dated April 1, 2005, were intended to be an April Fool's Day joke. SA McKenna acknowledged that he had created the sixth memo, entitled "Four Step Get Over It Process." SA Kelly admitted to the investigators that he had created the gun range target poster with the plastic knives.

Mr. Sykes was briefed about the fact-finding efforts and its conclusions on April 27, 2005. Immediately thereafter, in Mr. Sykes's presence, DAD Grupski called AD Sullivan and briefed him on the results of the fact-finding investigation. Mr. Sykes then voiced his objections to the findings to AD Sullivan. At the end of the conversation, AD Sullivan advised Mr. Sykes that he would be reassigned.

**D. Comparators**

On April 28, 2005, Mr. Sykes was reassigned from his SAIC position to the position of ASAIC at the J.J. Rowley Training Center ("Training Center") in Maryland. The reassignment was from one Supervisory Criminal Investigator GS-15 position to another Supervisory Criminal Investigator GS-15 position. Therefore, Mr. Sykes retained the same pay and grade. Mr. Sykes was

fully compensated for the expenses related to his relocation from Texas to Maryland. Mr. Sykes was not the only GS-15 considered for the ASAIC position at the Training Center. Two other GS-15s bid on the same position that Mr. Sykes was ultimately given: one was a GS-15 SAIC and one was a GS-15 Inspector. Def.'s Mot., Ex. 16, Prewitt Decl. 3.

There were twenty-two ASAICs stationed at the Training Center between January 1, 2000 and December 31, 2005. Def.'s Statement of Mat. Facts ("Def.'s Facts") ¶ 59. Of these twenty-two ASAICs, four had been SAICs immediately prior to their assignment to the Training Center as ASAICs. *Id.* One of these individuals had been the SAIC of the Office of Protective Operations. *Id.* With regard to career development, in subsequent assignments, five of the twenty-two ASAICs have served or are serving as Deputy Assistant Directors and one is currently serving as an Assistant Director in the Office of Investigations. *Id.* ¶ 60. Of the twenty-two ASAICs, ten were accepted into the Senior Executive Service Candidate Development Program and four were placed into SES-level positions. *Id.* ¶ 61. Of those who were placed into SES-level positions, one had been an SAIC in the Office of Administration immediately prior to becoming an ASAIC at the Training Center. *Id.*

Since his reassignment to the Training Center, Mr. Sykes has not bid for reassignment. Sykes Dep. 349. Mr. Sykes explains that he has "no reason to believe that [now-Director Sullivan] would be receptive . . . to assigning me to any other position." Sykes Dep. 350. However, Mr. Sykes has not spoken with Director Sullivan about the possibility of reassignment. *Id.* In the four years since his reassignment, Mr. Sykes has not competed for the Senior Executive Service Candidate Development Program. Def.'s Facts ¶ 72. Though he has not actively sought outside employment, Mr. Sykes has received approximately four job offers since his reassignment

from the SAIC of the Johnson Protective Division to the ASAIC at the Training Center. Sykes Dep. 349, 355-57.

In his current assignment at the Training Center, Mr. Sykes directly supervises four GS-14s and is the second-line supervisor of approximately twenty-four employees.[6] Sykes Dep. 352-54. While he was the SAIC at the Johnson Protective Division, Mr. Sykes supervised one GS-14 ASAIC and approximately nine Special Agents and four special officers. Sykes Dep. 157-58. Currently, Mr. Sykes oversees the Training Management Branch, which consists of four different Sections: the Administration Section, the Mission Research Policy Development Section, the Registrar Section, and the Student Affairs Section. This branch administers and oversees the Service's administrative procedures, policy development, and student affairs as well as the coordination and registration of all internal and external training. On July 19, 2005, Mr. Sykes filed a formal administrative complaint with the Secret Service, alleging discrimination on account of his race.[7]

Lady Bird Johnson passed away on July 11, 2007. The SAIC of the Johnson

---

[6] In his deposition, Mr. Sykes testified that he supervises a total of approximately 24 employees at the Training Center. Sykes Dep. at 352-54. In an earlier affidavit, he stated that he supervises approximately 32 employees. Def.'s Mot., Ex. 18, Sykes Decl. 3. For purposes of comparison to his prior position as the SAIC at the Johnson Protective Division, the difference is not material.

[7] One aspect of Mr. Sykes's complaint concerned a new pay system, commonly known as HR MAX, *see* Compl. ¶¶ 59, 74, but that new system has not been implemented and there are no plans to do so. *See* Def.'s Mot., Ex. 22, HR MAX Rescission Notice; Def.'s Facts ¶ 76. This Court enjoined implementation of HR MAX in a separate matter. *See Nat'l Treasury Employees Union v. Chertoff*, 385 F. Supp. 2d 1 (D.D.C. 2005); *see also Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) (affirming in part and upholding the injunction of HR MAX). Thus, the Court will ignore arguments concerning the HR MAX system as a source of potential economic injury to Mr. Sykes.

Protective Division at the time of her death was reassigned to an ASAIC position. Def.'s Facts ¶ 70. The Johnson Protective Division was then disbanded.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the

absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.* In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III. ANALYSIS

Title VII prohibits an employer from discriminating on the basis of race, color, religion, sex, or national origin in hiring decisions, in compensation, terms, and conditions of employment, and in classifying employees in a way that would adversely affect their status as employees. *See* 42 U.S.C. § 2000e-16. Under Title VII, a plaintiff must first establish a prima facie case of racial discrimination by showing that "(1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137 (D.C. Cir. 2008) (noting that the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies in employment discrimination cases).

After a plaintiff puts forth a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employer's action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Once the defendant has "asserted a legitimate, non-discriminatory reason for the decision, the district court need not -- *and should not* -- decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). At this point the

*McDonnell Douglas* framework melts away and the relevant question becomes whether the plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ." *Brady*, 520 F.3d at 494; *see also Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 17 (D.C. Cir. 2009) (noting that once defendant offers a non-discriminatory reason for employment action, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory [or retaliatory] reason.") (quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).

Although Mr. Sykes is a member of a protected class as an African American, it is disputable whether he has demonstrated that his reassignment constitutes an adverse employment action under Title VII. However, this inquiry is mostly irrelevant at this stage because the Defendant has offered a justification for its decision to reassign Mr. Sykes. Therefore, the central question is whether Mr. Sykes has provided sufficient evidence for a reasonable jury to find that the Defendant's stated reasons for his reassignment were a mere pretext for discrimination. *See Brady*, 520 F.3d at 494.

The Court finds that Mr. Sykes has not rebutted the Service's proffered reasons for his reassignment. The ample record supports the Service's assertion that Mr. Sykes was reassigned based on the perceptions of his first and second line supervisors that he had been less than effective managing the relatively small Johnson Protective Division. Then-AD Sullivan decided to reassign Mr. Sykes after the disappointing report from the 2004 office inspection of the JPD, the sexual harassment incidents and management's response, low morale demonstrated by the mock

memoranda and gun range target, and Mr. Sykes's accusation that one of his agents had engaged in misconduct caused by a psychotic disorder prior to any substantive investigation. Only suspicion, not evidence, supports Mr. Sykes's argument that his transfer to the Training Center constituted an adverse action based upon race. Mr. Sykes fails to demonstrate a genuine issue of material fact that the Service's reassignment of him was a mere pretext for racial discrimination. Summary judgment will be granted to the Defendant.

### A. The Reassignment to the Training Center Was Not An Adverse Employment Action[8]

In order to constitute an adverse action that is subject to redress under Title VII, an employee must experience, due to his protected status, a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2007). "[M]ere idiosyncrasies of personal preference are not sufficient to state an injury. . . . Purely subjective injuries, such as dissatisfaction with a reassignment . . . or public humiliation or

_____

[8] The Service has provided a legitimate, non-discriminatory reason for its reassignment of Mr. Sykes, therefore, whether Mr. Sykes has established his prima facie cases of discrimination is not the fundamental question. *See Brady*, 520 F.3d at 494. Although analysis of whether Mr. Sykes has demonstrated an adverse employment action may be unnecessary, *see, e.g., Dews-Miller v. Clinton*, 2010 U.S. Dist. LEXIS 41288 *54-55 n. 18 (D.D.C. Apr. 27, 2010) (foregoing an analysis of whether plaintiff had established an adverse employment action — although suggesting as much — and instead proceeding directly to consideration of whether discrimination was proven); *Kersey v. Wash. Metro. Area Transit Auth.*, 533 F. Supp. 2d 181, 197 (D.D.C. 2008) (bypassing analysis of prima facie case in granting summary judgment as plaintiff failed to rebut the defendant's non-discriminatory justification for its conduct), this discussion provides a further rationale for the granting of summary judgment and greater context as to whether the evidence supports a claim of discrimination. *See Royall,* 548 F.3d at 144 (noting that a court "must determine whether a reasonable jury could infer discrimination based on the prima facie case, the plaintiff's challenge to the employer's proffered justification, and any other evidence of discrimination") (quotations omitted).

loss of reputation . . . are not adverse actions." *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002) (citations omitted).

A lateral transfer — even to another state — that is unaccompanied by a diminution in pay, benefits, or significant responsibilities will not generally rise to the level of an adverse employment action. *See Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 71 (2006) (finding that "reassignment of job duties is not automatically actionable"). For a lateral transfer to constitute an adverse action it must impose "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio*, 306 F.3d at 1131. Therefore, even without a diminution in salary, grade level, or benefits, a lateral transfer can constitute an adverse action if the new responsibilities are sufficiently less important. *See Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007). The fact that job duties may be different or less desirable is not enough; there must be "significantly different — and diminished — supervisory and programmatic responsibilities." *Id.* (quotations omitted). In other words, a "transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Brown v. Brody,* 199 F.3d 446, 452 (D.C. Cir. 1999); *see also Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (finding that "[a]n employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage") (citation omitted); *Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008) (finding no adverse action where plaintiff's new responsibilities "did not constitute qualitatively inferior work requiring any less skill or knowledge").

Mr. Sykes argues that this particular reassignment meets the legal definitions of an

adverse employment action, despite the similarity of his pay[9] and benefits, because his reporting

chain is longer and the "change in title alone — from SAIC to ASAIC — is quite significant in the

Secret Service, a hierarchical organization where titles denote an agent's standing and power . . . ."

Opp'n. 25-26. The longer reporting chain — first to the Deputy SAIC of the Training Center, second

to the SAIC of the Training Center, and third to the DAD for Training, instead of reporting directly

to the DAD for Protective Operations — does not, by itself, demonstrate anything but the

organization of the Secret Service. Only if Mr. Sykes can demonstrate that his current position

entails, *inter alia*, fewer significant responsibilities, fewer high-graded direct reports, or fewer

promotion opportunities, might the longer reporting chain in this particular agency, for this particular

assignment, take on significance. Furthermore, although the Service might "lend a lot of credence

to titles," Opp'n, Sullivan Dep. 152[10], the Defendant has demonstrated that Mr. Sykes is one of

several who served as an SAIC and then went on to an ASAIC position. *See* Def.'s Mot., Ex. 21,

O'Donnell Declaration.[11] In fact, the move from an SAIC to an ASAIC does not appear to be

uncommon, nor does the record show that such a move would necessarily come with any attached

stigma.

---

[9]  Mr. Sykes's base pay as a GS-15 remains the same after his reassignment. In fact, due to a change in locality, Mr. Sykes's annual salary increased slightly from $137,600 to $142,840.

[10]  Found at Docket #37-5.

[11]  Mr. Sykes complains that the Defendant improperly introduces evidence of the assignments and reassignments of other SAICs without having produced that data during discovery. Opp'n 36-37. Such a complaint is a canard. Mr. Sykes and his experienced counsel were notified in the Defendant's initial disclosures that a personnel representative with knowledge of the bidding/reassignment process would have useful information. Specifically, Defendant identified Ms. O'Donnell as one of the people who contributed information to Defendant's interrogatory responses. There was no failure on Defendant's part. Mr. Sykes did not follow these leads.

Recognizing these legal requirements, Mr. Sykes argues that his duties at the Training Center are "greatly diminished" from his prior position. Opp'n 26. While it is true that his duties have definitely *changed*, it cannot be said that they are "greatly diminished." While Mr. Sykes enjoyed operational autonomy as the SAIC of the Johnson Protective Division, it was a quiet assignment, with no direct threats to an elderly, ill person, with a small complement of agents. At the Johnson Protective Division, Mr. Sykes supervised an ASAIC and approximately nine Special Agents and four special officers, whereas at the Training Center, Mr. Sykes directly supervises four GS-14s and is the second-line supervisor of approximately twenty-four employees. Although Mr. Sykes may prefer to supervise Special Agents, *see* Opp'n 31, this change does not represent significantly diminished supervisory responsibilities.

Mr. Sykes now directs four divisions with overall responsibility for the Service's administrative procedures and policy development for the entire Training Center, as well as student affairs and the registrar. Def.'s Facts ¶ 66. It encompasses training for all of the Service's employees — numbering between 6,500 and 6,700 — from Special Agents and Uniformed Division Officers to administrative, professional and technical staff. *Id.* While Mr. Sykes may have "no roll in conducting training, developing curriculum, or making policy related to the Training Center," Opp'n 31, and may only do administrative paperwork, *id.*, the record fails to establish that Mr. Sykes's responsibilities have been "greatly diminished." While the scope of his present responsibilities may not be as satisfying to Mr. Sykes as leading a protective detail, it cannot objectively be said that his present duties are any less critical to the mission of the Secret Service or that his responsibilities have been significantly diminished.

Regarding his promotion possibilities, Mr. Sykes argues that his current position is

"much less visible" than his prior position as SAIC of a protective division. Opp'n 26. He contends that the protective work of the Secret Service is the more prestigious work in the agency and, therefore, his reassignment from a protective detail to the Training Center "was an effective demotion in terms of his supervisory reporting relationships, title, duties, and visibility within the agency." Opp'n 26-27. Mr. Sykes cites himself for these propositions. *Id.* The Court does not disagree that an involuntary transfer from the JPD to the Training Center might have affected Mr. Sykes's standing and promotion opportunities within the Secret Service but there is no objective or historical evidence to support this proposition. SAICs have become ASAICs at the Training Center and other ASAICS within the Training Center have certainly advanced within the Service. Mr. Sykes has completely failed to test the question by applying for promotion or SES consideration.

There is simply nothing in the record to suggest that an assignment to the Training Center is an obstacle to a career within the Service, and nothing in Mr. Sykes's career since that reassignment suggests that he is barred from further advancement. His reviews have ranged from acceptable to exemplary. Opp'n, Ex. 13, Sykes Reviews. Mr. Sykes's subjective belief that he cannot further succeed is insufficient to demonstrate that the reassignment was an adverse action when the evidence indicates otherwise.[12]

---

[12] Mr. Sykes argues that he "lost pay," Opp'n 32-33, as a result of the reassignment because he is no longer eligible for an SAIC bonus and he is subject to Maryland State income tax. Plaintiff admits that his reassignment "did not adversely change his base pay." Compl. ¶ 51. There is no such thing as an SAIC bonus; Mr. Sykes remains as eligible now as he was at the JPD to receive awards and he has, in fact, received multiple awards since his reassignment. *See* Reply [Dkt. #44], Ex. 38, Brown Declaration. Finally, the impact of state income taxes has never been recognized as adverse and will not be so recognized here, especially as Mr. Sykes agreed upon hire that he could be reassigned anywhere throughout his career.

### B.  There Is No Evidence of Pretext

The Court must look to whether a reasonable jury could conclude from the evidence that the Service's justification for Mr. Sykes's reassignment was disingenuous and that his race was the true motivator.  To prove pretext, a plaintiff must articulate specific and "significantly probative" evidence that a defendant's provided reasons were false.  *See Sharpe v. Bair*, 580 F. Sup. 2d 123 (D.D.C. 2008); *see also Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002) (finding that summary judgment may be granted if a plaintiff's evidence of pretext is "merely colorable" or "not significantly probative").  Based on the record, Mr. Sykes has failed to do so.  Assuming arguendo that Mr. Sykes established that his reassignment constituted an adverse employment action, he failed to proffer sufficient evidence for a reasonable jury to conclude that the Service's justification for his reassignment was a pretext.

### 1.  The "Lie"

Although the parties differ in their characterization of the incidents that peppered Mr. Sykes's tenure as the SAIC of the Johnson Protective Division, Mr. Sykes does not argue that none of these performance issues occurred.  The Defendant established that Mr. Sykes was reassigned following the April 2005 fact-finding, which then-AD Sullivan initiated due to the repeated incidents occurring at the Johnson Protective Division.  AD Sullivan reassigned Mr. Sykes based on his belief that Mr. Sykes was ineffectively managing the JPD due to the combined results of the 2004 routine office inspection, the special investigation into the sexual harassment incident, and the 2005 fact-finding**.**  Def.'s Mot., Ex. 5, Sullivan Dep. 108-111.  Yet, Mr. Sykes argues that "Mr. Sullivan lied when he said that the decision to reassign Mr. Sykes was based on the April 26-27, 2005 fact-finding conducted by Mr. Grupski and Mr. Buster."  Opp'n 39.  In fact, he argues, "the process of

reassigning Mr. Sykes was underway long before the fact-finding began." Opp'n 39. He bases this argument on his Exhibits 23 and 24.

Plaintiff's Exhibit 23 is a Request for Personnel Action Form (SF-52) reflecting Mr. Sykes's reassignment from SAIC of the JPD to ASAIC at the Training Center. Opp'n, Ex. 23. It was signed on March 22, 2005, by the SAIC of the Training Center, and approved on March 24, 2005, one month before the 2005 fact-finding began at the Johnson Protective Division. *Id.* Plaintiff's Exhibit 24 appears to show that the Advisory Board recommended Mr. Sykes to fill the ASAIC position at the Training Center on "5/4/13," which is logically interpreted as April 13, 2005. Opp'n, Ex. 24. AD Sullivan and Mr. Prewitt were both members of the Advisory Board and would have been involved in the recommendation reflected in Exhibit 24. Opp'n, Excerpts of Sullivan Deposition 181-84.[13] In other words, Mr. Sykes argues that the decision to reassign him to the Training Center was finalized by Messrs. Sullivan and Prewitt by April 13, 2005, at the latest. Mr. Sykes attempts to use this analysis to show that any decision to reassign him based upon the April 26-27, 2005 fact-finding was a mere pretext for race-based discrimination.

Upon closer inspection of Exhibit 23, however, it becomes clear that "[t]he version of the SF-52 that Plaintiff submitted as an exhibit omits a key word from the document — that the action requested by the SF-52 was for a 'Bid,' and does not represent the date on which Plaintiff was reassigned or his reassignment was initiated." Reply [Dkt. #44] 24; *Id.* Ex. 35, Walker Declaration ("Walker Decl.") ¶¶ 3-4, 33, 37. In the Secret Service, when an office wants to open a vacancy announcement for bidding by agents, it submits a "Bid SF-52" that identifies the position, its grade level, where it is located, and its position number. Walker Decl. ¶¶ 3-4. Therefore, the March 22,

_____

[13] Found at Dkt. #37-5

2005 and March 24, 2005 signatures on the SF-52 merely reflect the dates that the SAIC and the AD requested that the ASAIC position at the Training Center be open for bid. Id. ¶¶ 4, 21. Once an individual is selected, the Bid SF-52 is completed by handwriting in the selectee's relevant information, as well as the type of action and the effective date. *Id.* ¶ 18. It is clear when comparing Mr. Sykes's Exhibit 23 to the Walker Declaration, that the word "Bid" was omitted from the SF-52 relied upon by Mr. Sykes.

Similarly, the allegation that Mr. Sykes's name was added to the bid list on April 13, 2005 — before the fact-finding began — is unsupported. The "run date" of April 13, 2005 on Mr. Sykes's Exhibit 24 is the date the report containing all the bids was run, *i.e.*, printed, not the date that the Advisory Board meeting was held and it was decided that Mr. Sykes should be reassigned. Walker Decl. ¶¶ 28-31. The document shows that Mr. Sykes was not a bidder on the ASAIC position at the Training Center. After the Advisory Board met on April 28, 2005, Mr. Sykes's name was entered in handwriting as the selectee. Mr. Sykes's declaration that Mr. Sullivan "lied" and that the decision to reassign him was made before the fact-finding investigation now lacks any foundation in the record. Mr. Sykes has merely mis-interpreted the dates on the documents to connote some sinister meaning that evaporates upon examination.

## 2. The "Sham"

Mr. Sykes contends that the April 2005 fact-finding effort was a sham. He challenges every aspect of the work done by Messrs. Grupski and Buster because they "failed to ask basic questions in witness interviews or do fundamental investigatory work," and, worse yet, they "influenced the direction of the interviews to suit their agenda, and disregarded information that did not." Opp'n 40. For this proposition, he cites the Depositions of Messrs. Grupski and Buster. He

also cites the Witness Affidavits of Daniel Klish, Mary Bargo, and David Checki, which were given during the investigation of Mr. Sykes's EEO charge.

Mr. Klish acknowledges that he does not know if race played any factor in the reassignment of Mr. Sykes but that he, Mr. Klish, believes the reassignment was unfair. Opp'n, Ex. 17, Klish Aff. 2 ("I cannot say if race was a factor in his reassignment, although I do think that Mr. Sykes was not treated fairly"). Concerning DAD Grupski's fact-finding interview, Mr. Klish stated:

> I tried to explain to Mr. Grupski that based on my knowledge of two of the individuals involved in the prank and their angry, bitter feelings; [sic] I believed that perhaps there was reason to be concerned for the safety of others on JPD, especially the supervisors, and possibly myself.
>
> When I attempted to articulate my feelings, Mr. Grupski dismissed my comments and made it clear that he already had made up his mind on the matter regarding how to handle the prank and the employees associated with it.
>
> At this point, my comments were futile and the conversation moved on to other topics.

*Id.* at 4.

Mr. Klish and two other agents agreed afterwards that DAD Grupski "seemed to be on a mission and was not interested in their thoughts." *Id.* Mr. Klish was not present when the prank took place but was briefed about it later. *Id.* Ms. Bargo was the administrative officer at the Johnson Protective Division. She told DAD Grupski that she "had become nervous and fearful for my safety" because of the nature of the mock memoranda posted in Mrs. Johnson's home. Opp'n, Ex. 16, Bargo Aff. 2. She provides no other admissible evidence concerning DAD Grupski's questioning that would support Mr. Sykes's current argument.

Mr. Checki was a Special Agent on the Johnson Protective Detail. As arguably relevant, in his Witness Affidavit, he stated:

I believe that Mr. Grupski's visit of the JPD detail during the week of April 25th thru 28th, 2005 was to investigate a possible EEO matter concerning a hostile work environment. [sic] (i.e. poster material and fake memorandums). During this investigation, I believe Mr. Grupski had a different agenda due to his one-sided view with JPD personnel and me. In my opinion, Mr. Grupski seemed to be influencing the direction of the interview from a hostile work environment towards inadequate supervision of the JPD Detail.

Opp'n, Ex. 15, Checki Aff. 2.[14]

None of these affidavits carries the point. Mr. Klish was not present when the incident occurred and could not provide any information to DAD Grupski except his own suspicions. Ms. Bargo provides no information that is useful to Mr. Sykes's argument. Mr. Checki suggests that DAD Grupski thought that inadequate supervision was the issue, not a hostile work environment. DAD Grupski might have so thought given the incidents involving sexual harassment — a male agent exposed himself twice to a female agent and she felt unable to report it to the SAIC on this small detail — and the fake memoranda and gun range poster. Moreover, the subjective impressions employees might express as to the thinking and reasoning of a supervisor do not constitute evidence.

Mr. Sykes also argues that since the team failed to investigate thoroughly his claims that SA McKenna was exhibiting serious behavioral problems, which he claims was the purpose for the investigation. See Opp'n 41. Even if the investigation were less than thorough on the question of SA McKenna and the fact-finding instead focused mostly on Mr. Sykes's leadership of the JPD, this only reveals that Mr. Sykes misconstrued the purpose of the fact-finding in the first place. See 2005 Fact Finding 4 (noting that AD Sullivan initiated the fact finding upon learning of the discrepancy between Mr. Sykes's claim that SA McKenna authored the fake memoranda and SA

---

[14] Mr. Checki also stated: "I believe that Mr. Grupski presented a general manner of dislike for Mr. Sykes." Checki Aff. 2.

Moore's email stating that he had written five of the memoranda); *id*. at 1 (noting that "in response to the aforementioned draft memorandums, ADPO Mark Sullivan initiated a fact finding inquiry regarding the issues detailed in the JPD office inspection and special investigation [involving the sexual harassment incidents], and the contents of the draft memorandums of SAIC Sykes regarding JPD personnel").

This Court may not agree with DAD Grupski's treatment of Mr. Sykes or the Advisory Board's ultimate decision to reassign Mr. Sykes, but this issue is not up for the Court to consider. Title VII does not punish employers for poor decisions, unless those decisions were motivated by race. *Brown,* 199 F.3d at 458-59 (finding that "[a]s courts are not free to second-guess an employer's business judgment, a plaintiff's mere speculations are insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment") (internal quotations omitted); *see also Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) ("We have consistently declined to serve as a 'super-personnel department that reexamines an entity's business decisions.'") (citation omitted). The issue at hand is whether Mr. Sykes has demonstrated that the Service's justification for his reassignment was a mere pretext for racial discrimination, which he has not.

Beyond failing to show that the Service's stated justification for Mr. Sykes's reassignment was false, Mr. Sykes also fails to demonstrate that race played any role in his reassignment. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517-19 (1993) (stating that it is not true "that all the plaintiff need do is disprove the employer's asserted reason . . . [i]t is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination"). Mr. Sykes first points to a forwarded email from DAD Grupski

containing an "ugly, racially derogatory 'joke' made at the expense of African Americans." Opp'n 9; Opp'n, Ex. 32, Grupski Email. While insensitive at a minimum, Mr. Sykes fails to demonstrate any nexus between the email and his own reassignment. *See, e.g., Simms v. U.S. GPO*, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000) (noting that racist "'stray remarks,' even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff"); *Prater v. FedEx Corporate Servs.*, Civ. No. 07-22, 2009 U.S. Dist. LEXIS 51146, at *23-24 (D.D.C. June 18, 2009) (finding no inference of discrimination where no nexus existed between a "remark made in a joking manner" and several general comments about African Americans and the plaintiff's termination). More importantly, DAD Grupski was not the decision-maker when it came to Mr. Sykes's reassignment. That a supervisor once forwarded a racially-derogatory email does not, in itself, demonstrate that the actual reason for Mr. Sykes's reassignment was racial animus.

Mr. Sykes also attempts to show that the Service has engaged in a pattern of treating African Americans differently than non-African Americans. For this proposition, he argues that the three Special Agents who were involved in the misconduct involving the fake memoranda at the JPD, DAD Grupski, SAIC Donald White, and a former SAIC at the Training Center, who were all involved in misconduct, were treated more leniently by the Service. Opp'n 27-28, 44-45. These men are all Caucasian. Even assuming that six people is a sufficient sample size to demonstrate a pattern, Mr. Sykes fails to demonstrates that he is similarly situated to the three Special Agents who were under his command at the JPD. Mr. Sykes has neither shown that "all of the relevant aspects of [his] employment situation were 'nearly identical'" to those of the Special Agents nor that they were expected to exercise management of the detail. *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir.

1999); *see also Barbour v. Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999) (finding that two EPA employees with similar job descriptions, one a GS-12 and the other a GS-13, but slightly different duties were not similarly situated). As Mr. Sykes was the SAIC of the JPD and the superior of the three Special Agents involved in creating the fake memoranda and the gun target poster — and therefore potentially faced with higher expectations from Service leadership — their treatment by the Service following their misconduct is simply not comparable to the Service's treatment of Mr. Sykes.

Although DAD Grupski, SAIC Donald White, and a former SAIC at the Training Center were employees of the same or higher rank than Mr. Sykes, he still fails to show that their charges or alleged misconduct were comparable. *Holbrook*, 196 F.3d at 261. Mr. Sykes was reassigned due to perceived managerial difficulties, not misconduct. This last point aside, that DAD Grupski, SAIC White, and the former SAIC at the Training Center were all allowed to keep their same titles, although two of them were reassigned, is not sufficiently probative of racial animus in the reassignment of Mr. Sykes. The Court is cognizant that "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence," *Hunt v. Cromartie*, 526 U.S. 541, 553 (U.S. 1999), yet Mr. Sykes has failed to provide evidence which would allow a reasonable jury to conclude that race was at the heart of the Service's decision to reassign him.

### IV. CONCLUSION

While it is clear that Mr. Sykes has had a distinguished career with the Secret Service, he is unable to survive the Defendant's motion for summary judgment. Mr. Sykes has not demonstrated that his reassignment was an adverse employment action. More importantly,

Defendant has proffered the legitimate, non-discriminatory reason of Mr. Sykes's poor managerial skills — as well as an evidentiary basis for this claim — as the basis for his reassignment.  Mr. Sykes offers no more than speculation and inadequate comparisons in his attempt to demonstrate pretext. Summary judgment will be granted to the Defendant.  A memorializing Order accompanies this Memorandum Opinion.


Date: May 11, 2010                                     _____/s/_____
                                                                  ROSEMARY M. COLLYER
                                                                  United States District Judge